[Civ. No. 6169. First Appellate District, Division One.—August **3,** 1928.]

LANE MORTGAGE COMPANY, Appellant, v. C. R. L. CRENSHAW et al., Respondents.

Lloyd W. Moultrie, E. A. Lane and Hunsaker, Britt & Cosgrove for Appellant.

Bicksler, Smith & Parke, Hiram E. Booth and Bicksler, Smith, Parke & Catlin for Respondents.

PARKER, J., *pro tem.*—In this action plaintiff seeks injunctive relief to secure the benefits to which it alleges itself entitled under a certain written contract. As a part of the same action plaintiff asks the court to declare the legal rights and duties of the respective parties under the said contract.

The court below denied the injunctive relief sought and declined to enter any declaratory judgment.

The plaintiff appeals from the judgment of the lower court and from the order denying its motion for a new trial.

The case presents two main points. We are called upon to determine whether or not the contract about which the controversy centers confers upon plaintiff a power coupled with an interest, and further to determine the application of the sections of our code providing for declaratory judgments. Without attempting at this point to make any determination of either question it is readily apparent that the application of the law in each of the issues must depend to a large extent upon the facts as disclosed. Therefore, we must in some detail recite the record.

In September, 1921, certain parties, called for convenience the Stolls, were the owners of a lot or parcel of land in the city of Los Angeles located at the corner of Spring and Eighth Streets in said city. In passing it might be added that this property was then of great value and since that time the value has been greatly enhanced. On September 1, 1921, the Stolls, as the owners of said lot, entered into a certain agreement of lease with a corporation known as San Joaquin Valley Hotel Corporation. The terms of the lease, as they are material to the present controversy, are as follows:

The period of the lease is ninety-nine years from the date thereof and the rental is one thousand dollars per month. The lessee, hereinafter referred to as Hotel Company, agrees to pay, in addition to the rent reserved, all rates, taxes, charges for revenue or otherwise, assessments and levies, general and special, ordinary and extraordinary, including

water rates, gas and electric light and power rates, lighting, street work, sanitary and safety requirements which may be charged, assessed, levied, or imposed upon the land or any buildings or improvements placed thereon. It is further provided that the lands and improvements shall always be assessed in the name of the Stolls, lessors, providing such manner of assessment is permitted under the laws relating thereto. The receipts for taxes paid must be delivered to the lessors at least five days before the date whereon taxes become delinquent. The Hotel Company further agrees to commence the erection of a building on or before one year from date of possession, and to erect, furnish, and complete the same with reasonable diligence at its own cost and expense, and in any event to have the same completed and ready for occupancy on or before September 1, 1926, fully paid for and free from all liens, compensation claims, or other construction claims liable to ripen into any lien on said premises; provided, however, that the obligation of the Hotel Company to complete the said building at its own cost and free from liens shall not be construed as to prevent the Hotel Company from mortgaging or otherwise hypothecating its interest in this lease or its interest in the demised premises for the purpose of obtaining money with which to pay for the erection of said building, nor shall it prevent the erection of said building in accordance with the terms of the lease by a subtenant of the Hotel Company. The building to be constructed on the property shall cover substantially the entire lot; shall be a class A reinforced concrete or steel structure, as the term ''class A'' is defined by the ordinances of the city of Los Angeles. It shall be a loft building with at least twelve stories and a finished basement, and shall actually cost and be reasonably worth when constructed not less than two hundred and fifty thousand dollars, and constructed in every respect in accordance with all laws and regulations affecting such construction in force at the time and during the construction. The Hotel Company further agrees that it will keep insured in standard solvent fire insurance companies, approved as such by the lessors, during the demised term any and all buildings or improvements that may be built or placed upon the premises to an amount of not less than seventy

per cent of the cost of said buildings or improvements, and if the Hotel Company erects a building on said premises fully complying with the requirements of what is known as a class A fireproof building then said insurance shall not be less than forty per cent of the cost of said building. All policies of insurance are to be issued to both parties, as their interests may appear, and the policies themselves deposited with the Los Angeles Trust and Savings Bank (hereby designated as trustee) for the purposes following, to wit: The same to be held by the trustee as additional security for the rent and the rebuilding, in case of destruction. The Hotel Company agrees that in the event of the substantially total destruction of said premises by fire on or before September 1, A. D. 2017, immediately upon the payment of the insurance moneys received to the trustee, the Hotel Company will within thirty days thereafter advance and pay to the trustee the difference between the amount of insurance received and the sum of two hundred fifty thousand dollars, which said latter sum is to constitute a trust fund for the payment of the rents under the lease, as well as the rebuilding of the premises. All and every sum or sums of money which shall be received by the Hotel Company from insurance upon the building, except so much thereof as must be applied to the payment of rent due and to accrue, shall be laid out and expended by it in rebuilding or repairing said building, and in case the Hotel Company shall not have advanced the funds necessary to bring said insurance moneys up to two hundred fifty thousand dollars, if said destruction occurs prior to September 1, A. D. 2017, or shall fail to restore or repair such building at the time and in the manner specified, then it shall be lawful for the lessors to declare such term ended, and the buildings on the premises shall at once be forfeited to the lessors, and any insurance money remaining in the hands of the trustee shall be paid to lessors. In case the Hotel Company neglects to insure and keep insured the buildings and improvements then the lessors may at their election procure the insurance and add the amount of the premiums to the installment of rent next due with interest at seven per cent per annum. The Hotel Company further agrees that the premises and building or buildings which may at any time be thereon shall be used by the lessee only and exclusively for proper

and legitimate purposes. And it is expressly covenanted between the parties that the Hotel Company will not use or consent to the use in any manner whatsoever of the demised premises, or any buildings or improvements thereon, nor any portion thereof, for any purpose calculated to injure the said premises or the neighboring property, nor for any purpose or use in violation of federal or state laws or ordinances of the city of Los Angeles, or for any unlawful purpose whatsoever, or for any trade, business, occupation or vocation whatever which may in anywise be unlawful. And the Hotel Company will at its own cost and charges keep the buildings, sidewalks, steps, and excavations under the sidewalks in good, safe, and secure condition, and will from time to time at its own expense make all structural alterations, changes or repairs which may be by law required in connection with the use, or by reason of any use to which said building is put, or by reason of its maintenance.

It is agreed that upon conditions not necessary to enumerate the lease may be assigned, and the agreement gives notice that any assignment not in strict conformity with the provisions thereof shall be null and void, and provided further that the assignee shall take subject to all conditions, covenants, agreements, and obligations to be performed by the Hotel Company.

It is agreed, covenanted, and understood between the parties thereto that in case at any time default shall be made by the Hotel Company in the payment of any rent provided for upon the day the same becomes due or payable, and such default shall continue thirty days after written notice to the Hotel Company, or in case at any time default shall be made by the lessee in payment of any taxes, charges, or assessments levied or assessed against said property, and such default shall continue for thirty days after notice thereof in writing by the lessors to the Hotel Company, then in any or either event it shall be immediately lawful for the lessors at their election to declare said demised term at an end and enter into said demised premises and the buildings or improvements situated thereon, or any part thereof, and with process of law to re-enter and remove all persons therefrom.

Thereafter follow provisions granting the right to re-entry on failure of Hotel Company to keep the buildings insured,

and providing further that such default may be cured by full compliance with these terms within six months after re-entry following default.

It is mutually covenanted and agreed that the various rights, powers, options, elections, appointments, and remedies of the lessors contained in the lease shall be construed as cumulative and no one of them as exclusive of the other or exclusive of any rights or priorities allowed by law.

This agreement and lease was duly acknowledged by the parties executing the same, being all of the parties thereto, and was recorded in the official records of Los Angeles county on November 29, 1921.

It will be readily observed that the main scheme of this lease and agreement was to improve the land by the erection of a building appropriate to the location of the lot.

On December 31, 1921, the Hotel Company made and entered into a lease and agreement with Lane Mortgage Company, a corporation, plaintiff herein. For identification this corporation will hereinafter be referred to as the Lane Company. This agreement recites the execution of the lease between Stolls and the Hotel Company and recites further the obligation of the Hotel Company to erect a building, and also that the Hotel Company is about to commence the construction of the building in accordance with the terms of the lease. The agreement then specifically states as follows:

''Whereas, said lease is valuable to the San Joaquin Valley Hotel Company, party of the first part herein, and was procured for it by the Lane Mortgage Company, party of the second part herein, and said last-named company has agreed to finance the construction of said building by loaning to the party of the first part the sum of two hundred thousand dollars for the purpose of erecting said building, taking as security certain bonds secured by deed of trust thereon: Now, therefore, in consideration of the premises and the procurement of the lease aforesaid and the financing of said building as aforesaid, and as part of one and the same transaction, and in further consideration of the sum of ten dollars, the said party of the first part does hereby lease and let to the party of the second part, its successors and assigns, the entire second floor of the building to be erected on the premises above described; To have and to hold said second floor of said building for the term of twenty years

commencing on October 1, 1922, or from the date of the completion of said building if the same is not fully completed on said date, without further payment of rent for said term.''

Then follow the terms and conditions upon which the lease is given, made and executed, viz.:

1. The second floor shall be completely finished by Hotel Company, including hall partitions, toilets, janitor rooms, lighting fixtures, etc.

2. Hotel Company during term of lease shall furnish without charge during term of lease elevator service, water, and heat.

3. That no part of said building shall be leased or rented for manufacturing or other purposes during said term that will be a detriment to a high-class loft building in the financial district.

4. That tenants occupying other portions of said building during the term of this lease shall have no advertising privilege except from their names on the directory of the building and lettering on the windows, such signs and lettering to be approved by Lane Company.

5. The Hotel Company will keep the building in first-class repair and condition at its own expense, including all plumbing.

6. Lane Company to make any desirable changes on second floor and install vaults, fixtures, etc., with right to remove the same.

7. Lane Company will not permit improper use of building or use that will disturb or injure other tenants.

8. Provides for rights in case of destruction of building.

9. Provides for month to month tenancy upon holding over after expiration of term.

The agreement and lease then further provides: For the consideration aforesaid and as part of the same transaction said Hotel Company does hereby appoint and employ said Lane Mortgage Company its sole and exclusive agent for the management of said building so to be erected from the completion of the same to the first day of October, 1942, with full power and authority to collect all rentals thereon and pay all operating expense, taxes, insurance, ground rental, interest on bonds and bonds as they mature out of the money collected, and procure or write all fire and earth-

quake insurance agreed to be carried by the Hotel Company, and the Hotel Company agrees to carry insurance of each of said classes amounting to at least two hundred fifty thousand dollars each for the protection of the Company and the bondholders, and the Hotel Company agreed to pay the Lane Company for such services a commission of 5 per cent of gross rentals and the regular brokerage paid insurance agents, it being understood and agreed that the agency and employment aforesaid shall be irrevocable during the time aforesaid except for wilful misconduct on the part of said party of the second part, and that all supervision and agency of the Lane Company shall terminate on October 1, 1942, unless any of the bonds above referred to purchased by the said Lane Company shall be outstanding and unpaid on said date, then such agency shall remain in full force and effect until all of said bonds are paid, at which time it shall terminate and end, provided, however, that at any time during the term of the lease the Lane Company may surrender its right to manage the building and to act as agent of the Hotel Company by serving a thirty-day written notice on the Hotel Company of its election to terminate at least thirty days prior to the actual termination thereof, and said agency shall terminate and end at the time designated in the notice without in anywise interfering with or modifying the leasehold interest of the party of the second part. It is further agreed as a part of the consideration aforesaid, the building to be erected shall be known as Lane Mortgage Building until October 1, 1942, and the Lane Company may maintain signs on the building displaying the name, and may at its option change the name.

The Lane Company shall render to the Hotel Company a complete report and statement of leases made, insurance placed, rents collected and disbursements at least once each month, and account for and pay to Hotel Company all moneys due it, and all leases shall be to such tenants and upon such terms as shall first be approved in writing by the Hotel Company.

The ordinary expense of collecting the rents shall be borne by Lane Company, provided that if any litigation is necessary to collect rentals or enforce payment of insurance, or any other cost or expense occurs in making any such collections, the same shall be paid by the Hotel Company.

This agreement, duly executed and acknowledged by the parties thereto, was recorded in the official records of Los Angeles County on January 13, 1922.

Thereafter the Hotel Company proceeded with the construction of the building and the same was practically completed by it on December 2, 1922. On this last-mentioned date the Hotel Company by a written instrument assigned to Crenshaw and Smailes, defendants herein, the lease and the building on the property. This assignment was made pursuant to and in compliance with the provisions of the original lease from the Stolls to the Hotel Company. No question is raised concerning this assignment as far as it operates to divest the Hotel Company of all interest in the subject matter of the present action. This assignment was expressly subject to a lease of the entire second floor in favor of Lane Mortgage Company for twenty years at a total rental of ten dollars. It may be added that a number of other subleases were likewise included with the Lane Company lease and running to various persons, firms, and corporations. On the same date as this assignment the defendants Smailes and Crenshaw addressed, signed, and delivered to the Hotel Company a writing in the following words:

"We understand that Lane Mortgage Company has an agreement with your company to manage and collect the rentals from the building on lot 11, block 51, Huber Tract, and to receive a fee therefor of five (5) per cent of the gross rental, and also the right to call said building 'The Lane Mortgage Building,' which agreement is for a period ending October 1, 1942, and we accept assignment and conveyance of the leasehold interest and said building with full knowledge of the existence of said contract and acquiesce therein."

Thereafter Smailes and Crenshaw proceeded with the completion of the building, and the same was ready for occupancy in January, 1923, at which time the various tenants, including Lane Company, entered into possession of the portions thereof leased to them. The total cost of the building was in excess of three hundred eighty-five thousand dollars, and the court below found that the lease and buildings were of a fair market value of one million dollars.

We have then the building completed. The defendants Smailes and Crenshaw own the building and the lease, and the plaintiff Lane Company holding the second floor under its lease from the Hotel Company, and managing the building, collecting the rents and exercising the powers and rights granted to it under the agreement with and lease from the Hotel Company. Thus prefaced with a detail necessary to a complete understanding of the situation, we come to the present controversy.

The plaintiff, Lane Company, in its complaint, sets up all the facts as hereinbefore stated with additional allegations. Plaintiff alleges that it negotiated the lease between Stolls and the Hotel Company, and in sundry ways aided and assisted the Hotel Company in obtaining the lease and in the construction of the building, and for these and various other considerations received the lease and agreement between Lane Company and the Hotel Company. Generally the gravamen of plaintiff's complaint is that soon after it took possession and assumed the management of the building the defendants Crenshaw and Smailes plotted and conspired to disregard, violate and hold for naught plaintiff's contract. Many allegations of specific acts follow. Summed up, plaintiff alleges that defendants refuse plaintiff the management of the building; that they collect the rents themselves, employ janitors and other help, assume to themselves the placing of insurance and the payment of taxes and ground rent. Likewise does plaintiff complain that defendants have ignored its right to have the building known as Lane Mortgage Building. Sufficient allegations appear to charge a complete disregard of plaintiff's claim to manage the building, collect rentals, employ help, procure insurance, etc. Plaintiff further alleges acts on the part of said defendants which are an interference with its right to the enjoyment and occupancy of the second floor of said building. Plaintiff then prays that defendants be enjoined from doing any and all of the acts complained of, and then follows this prayer: Plaintiff further prays that the court declare the rights and duties of plaintiff and defendants in and under said instrument and agreement of December 31, 1921, and the legal rights and duties of the respective parties to this action under that contract and in the controversy disclosed by this complaint; and determine that the proper

construction of the said instrument and agreement requires the granting of the relief herein prayed for by plaintiff and that the plaintiff is entitled to the remedies it claims in this action.

The defendants Crenshaw and Smailes by way of answer admitted taking over the management of the building paying taxes and ground rent, procuring insurance, etc.; in fact contend that the right and power given plaintiff in this behalf is a mere naked agency revocable by the defendants at their pleasure. Defendants, however, deny any present or intended interference with the plaintiff's right to possession of the second floor for the twenty-year term free of rental. They further allege that plaintiff has failed to properly manage the building and has been guilty of wilful misconduct. They allege their full compliance with the terms of the original ground lease from Stolls to the Hotel Company, and deny any interference on their part with the right of plaintiff to have the building known as and called Lane Mortgage Building. They allege further that plaintiff's right to manage the building and collect rentals, etc., was solely to secure to it the payment of a bond issue on the building, and allege further the payment of all sums due under the issue. Defendants affirmatively allege that the contract between Hotel Company and plaintiff, in so far as the agency features are involved, was without consideration, and further plead that the consideration supporting the leasehold interest being wholly as payment or bonus for a loan was usurious.

After a trial upon the issues the court below made its findings of fact and entered judgment denying plaintiff any injunctice relief, and declining to enter or make any declaration of the rights of the respective parties under the Hotel Company lease to plaintiff.

It will be unnecessary to detail all of the trial court's findings, but sufficient thereof may be given to amplify the respective contentions.

The court found as a fact and likewise drew its conclusion of law that the agency in favor of plaintiff set forth in said contract of December 31, 1921 (being the contract and lease agreement between the Hotel Company and Lane Company), is not coupled with any interest that plaintiff has or claims in the Lane Mortgage Building.

The trial court made another finding to the effect that the attention of the court had been called to the fact that there is another action pending in the superior court of the state of California, in and for the county of Los Angeles, by and between the same parties to the present action, wherein issue is raised as to the true consideration for said contract of December 31, 1921, and the court, decreeing a finding of fact on that issue not necessary or material for a decision herein, makes no finding of fact as to the true consideration for said contract or as to whether the consideration recited in said contract of December 31, 1921, is or was the true consideration therefor.

Still further the court finds "that the agency created in favor of plaintiff under the contract of December 31, 1921, to manage said Lane Mortgage Building was not given or entered into for the purpose of protecting any interest plaintiff now has or claims to have in said building, and was not given for any purpose other than the protection of the indebtedness evidenced by said $200,000.00 (two hundred thousand dollars) bond issue made by the Hotel Company and referred to in the agreement, and which said bond issue was fully paid and discharged on or about April 1, 1923; that the termination of plaintiff's agency for the management of said building does not and will not injure, depreciate or in anywise affect any interest or interests which plaintiff has or claims to have in said building."

It may be noted—of which more hereinafter—that the court likewise declined to find upon the issue as to whether or not Lane Company had been guilty of wilful misconduct, upon the expressed ground that the issue was not urged—practically a finding that the issue had been abandoned. Indeed, at the trial it was stipulated as follows: that Lane Company did all the work necessary or incident to the management of the building except that which it was prevented from doing by Crenshaw and Smailes, without carrying out any question of how well it was done or that defendant (*sic*) was not guilty in some instances of misconduct, but the actual performance is admitted.

We think the case sufficiently outlined.

█ The question of consideration, in contracts of this kind, is an important matter, and a finding should have been made if issue were joined. Defendants alleged a com-

plete lack of consideration, but offered not a single iota of evidence on the question. We think the court should have found that the consideration was as recited in the instrument. We are not holding that the defendants had the right to question the actual consideration, as that question is not before us. Defendants, as noted, offered no evidence on the subject, but base their contention upon a general argument by merely stating the claim that the instrument and agreement is unsupported by any consideration.

The facts in support of the agreement and its consideration appear as follows: The instrument being in writing imports a consideration, even without a recital thereof. The recitals in the instrument are conclusively presumed to be true as between the parties thereto or their successors in interest by a subsequent title (Code Civ. Proc., sec. 1962). This conclusive presumption does not apply to the recital of the consideration. However, the presumption would apply to the recital that "said lease is valuable to the Hotel Company and was procured for it by the Lane Company, and said Lane Company has agreed to finance the construction of the building by loaning $200,000.00 to Hotel Company for the purpose of erecting said building." The further recital in said instrument that the said services and loan by Lane Company constituted the consideration for the lease and agency are not deemed conclusive under the code section 1962, Code of Civil Procedure. However, section 1963 of the Code of Civil Procedure provides that it is a satisfactory presumption, if uncontradicted, that there was a good and sufficient consideration for the written contract. Taking these two presumptions together, the latter being wholly uncontroverted, the inequality between the two is slight. With it being conclusive that the recital is true, and an almost equally strong presumption that the contract was supported by an adequate consideration, then a strong inference arises sufficient to constitute a *prima facie* showing that the presumed consideration was and is as stated in the instrument. Aside from this there is direct evidence on the subject. The president of the Hotel Company who conducted the negotiations testified that there was nothing compulsory about the deal. It was a matter of negotiation. Mr. Lane proposed doing certain things under certain conditions, and Hotel Company agreed to those conditions.

It was necessary to do all those things in order to get the deal—the loan and the lease. Throughout the general negotiations between Crenshaw and Smailes and the Hotel Company the former dealt with the property conceding the lease and agreement with the Lane Company, and this was deemed an encumbrance in determining the value of the property. There were in evidence letters written by Lane Company to defendants Crenshaw and Smailes stating the consideration to be as recited in the instrument, and no evidence of denial or lack of acquiescence on the part of said defendants.

On the subject of consideration reference may be had to 6 Cal. Jur., section 132 et seq.

We conclude, therefore, that not only was it error to fail to find on the question of consideration, but also that on the face of the record the finding should have been that the true consideration was as recited in the instrument.

If this were not true, nevertheless, even in the absence of a finding on what constituted the actual consideration, a presumption would still remain and stand as a fact when not controverted that there was a consideration, and thãt it was adequate.

It would be an idle and vexatious requirement that a new trial should be ordered on account of this lack of a finding which the record compels. Section 4¾, article VI, of the state constitution, is designed to meet such a condition, and likewise the legislation adopted to effectuate the said constitutional provision of the Code of Civil Procedure, section 956a. Pursuant thereto we do find that the consideration supporting the agreement between Hotel Company and Lane Company was the consideration recited therein.

In passing it may be noted that the reason assigned by the trial court for refusing to make a finding was the pendency of another action between the parties. There is not a scrap of testimony, nor a statement of counsel, nor a suggestion of any sort in the record before us of or concerning any other litigation between the parties.

Summing up the entire transaction then between Hotel Company and Lane Company it may be thus narrated. The Hotel Company located a lot of land in a most prominent and promising section of the city of Los Angeles which was standing unimproved. In order to get a lease on

the lot the Hotel Company secured the services of the Lane Company, disclosed herein to be investment bankers. The Lane Company secured for the Hotel Company a lease for ninety-nine years upon the condition, among others, that a building costing not less than two hundred and fifty thousand dollars be erected upon the premises. As a part of the same transaction the Hotel Company agrees to give Lane Company a lease, free of rent, for twenty years on the second floor of the building to be erected, and the Lane Company agrees, in addition to its services in securing the lease, to finance the construction of the building through a bond issue of two hundred thousand dollars. The lease from the owners to the Hotel Company contains many conditions and restrictions. A violation of or noncompliance with these works a forfeiture of the land lease and of the building if erected. Therefore, it is most obvious that whatever value or worth attached to the Lane Company lease was conditional upon compliance with the terms of the land lease. If the Hotel Company defaulted in rental, or neglected to keep the premises insured, or permitted through lack of management the character or repute of the building to become unsound, or allowed the building to be used for unlawful purposes, then the lease of Lane Company was valueless. Also, if the Hotel Company should tire of its bargain with Lane, and by connivance or collusion bring about an apparent forfeiture sufficient to cause even an arranged ouster, Lane Company were left with no recourse unless advised of the facts. The history of man's dealings with his fellowman, as revealed in the reported case indicate that the bare lease under the conditions might have lost its worth much sooner than the expiration of the fixed term. However, after negotiating for and agreeing upon a twenty-year lease, weak with all the pitfalls and possibilities incident to the tenure of the Hotel Company, it was specifically made a part of the one and same transaction that a power should be given the Lane Company whereby it could protect and render secure and valuable the lease agreed upon. The power so given was the sole and exclusive agency to manage the building to be erected, thus giving to Lane Company the ability to protect the lease against a forfeiture of the land lease by reason of the building or any portion being used for any purpose calculated to injure the premises,

or by reason of any unlawful use, or through the building becoming in a state of dilapidation or unsafety. Likewise embraced within such granted power was the right to collect rentals and apply the same to the extinguishment of the various obligations resting upon the Hotel Company under the land lease, including the procuring of insurance, a compliance with which was compulsory under penalty of forfeiture.

The power thus given was declared by the trial court to be a mere naked power revocable at will by the Hotel Company or its successors, and not a power coupled with an interest as the term is understood in the law relating to principal and agent. In this holding the trial court was in error.

It is most difficult to frame an all-embracing definition of a power coupled with an interest. Most of the authorities on the subject seem to concede that such a power is recognized by the law, and when found to exist in any given case it is not revocable at the will of the principal and even survives his death. The question ever present is as to when such a power exists, and what conditions must be shown to manifest its existence. Many of the authorities approach the subject as though it were a thesis, and treat it in such an academic way as to be confusing. Much is said concerning what is not a power coupled with an interest, with little attempt at exactness concerning what actually constitutes the same. Some confusion arises in applying the doctrine of the older cases for the reason that the law of agency has, like other legal doctrines, undergone some change throughout the years. This is particularly so with reference to the limitations of certain powers of agency and the erstwhile presumptions attaching. Likewise certain terms current years ago at the present writing convey meanings entirely different from the then general acceptation.

The attitude of the California courts is not doubtful. Each case is determined from its own facts and the conclusions reached by a consideration of the entire instrument creating the power in question. The law of California is most fully and carefully expounded in the case of *Todd* v. *Superior Court*, 181 Cal. 406 [184 Pac. 684], and the application of the law as therein announced demonstrates the error of the court below. In the Todd case the supreme

court adopts the reasoning of the early case of *Hunt* v. *Rousmanier*, 8 Wheat. (U. S.) 174 [5 L. Ed. 589]. In this latter case the opinion of the United States supreme court was written by Chief Justice Marshall, and has come down through the years, remaining to-day the leading and accepted announcement of the legal doctrine of a power coupled with an interest.

Concretely a power is said to be coupled with an interest when the power forms part of a contract, and is a security for money or for the performance of any act which is deemed valuable, and is generally made irrevocable in terms, or, if not so, is deemed irrevocable in law. The supreme court in the Todd case, *supra*, quotes approvingly from *Hartley's Appeal*, 53 Pa. 212 [91 Am. Dec. 207], as follows: ''To impart an irrevocable quality to a power of attorney in the absence of any express stipulation and as the result of legal principles alone there must coexist with the power an interest in the thing or estate to be disposed of or managed under the power.''

We think that there is hardly a case that can be made to which these principles could have a more direct and fitting application than the case at bar. The Lane Company has a twenty-year lease in the entire second floor of the twelve-story building which is the subject of the power. That this is an interest there can be no question (*Union Trust Co.* v. *Reed*, 213 Mass. 199 [99 N. E. 1093]; *Inyo Water Co.* v. *Jess*, 161 Cal. 516 [119 Pac. 934]; *Walther* v. *Sierra Ry. Co.*, 141 Cal. 288 [74 Pac. 840]; *Payne* v. *Newell*, 155 Cal. 46, 49 [99 Pac. 476]; *Friedman* v. *Macy*, 17 Cal. 226; *Dahlberg* v. *Haeberle*, 71 N. J. L. 514 [59 Atl. 92]; *Brickill* v. *Atlas Assurance Co.*, 10 Cal. App. 17 [101 Pac. 16]; 16 Am. & Eng. Ency. of Law, 2d ed., 1102). The interest does not arise only upon the execution of the power, as was the situation in *Hunt* v. *Rousmanier, supra*, or *Todd* v. *Superior Court, supra*. It is a live, active, valuable interest, coupled with the power to the extent that if the power did not exist the interest would be subject to destruction or forfeiture. The lease, as hereinbefore pointed out, would be totally valueless in the absence of compliance with the provisions of the original land lease. The powers granted the Lane Company in their total amount to no more than placing in the hands of the company directly the means of

preserving its said interest. This manifestly constitutes such a power as Chief Justice Marshall refers to in *Hunt* v. *Rousmanier, supra,* namely, a power forming part of the contract and security for the performance of an act deemed valuable. The power in the present case was expressly made irrevocable and expressly tied to the entire transaction in the creation of the leasehold interest. We would concede that if the Lane Company merely held an agency to collect rents and retain five per cent commission the agency would be revocable. But the mere fact that, incidental to the execution of the coupled power, an additional interest is created in the proceeds thus derived in no sense impairs the coupling of the power and interest theretofore existing.

Respondents insist that the agency is a mere naked power revocable at will. Their first contention, if sustained, would settle the dispute at once. They approach the problem of the connection between the power and the interest in much the same manner as was employed in the difficulties surrounding the untying of the Gordian knot. They contend first that by considering the power as separate and distinct from the interest, and not essential thereto, we have a simple agency. They then apply the accepted rule that such an agency is not coupled with an interest and therefore revocable. This contention is already determined.

Next respondents contend that because the power may, at the option of the agent, be surrendered without affecting the leasehold interest, therefore the power and interest are not coupled sufficiently to meet the requirements of the rule. *Arguendo,* it could as well be determind that the insertion of this obviously cautionary provision would demonstrate the intended connection, and, recognizing the existence of the jointure, thus specified the saving of an interest which the loss of the coupled power might have destroyed. However, it is not necessary to argue the point. The security for the performance of an obligation may be voluntarily surrendered without impairing the said obligation, and the fact that the power and interest may at some time be severed by the voluntary act of Lane Company in no way alters the present connection between them as herein found to exist.

■ Much is said by respondents on the point that the Lane Company was required to execute leases in the name of and subject to the approval of the lessors of the ground, the Hotel Company. Respondent argues that under the doctrine of the cases of *Hunt* v. *Rousmanier, supra,* and *Todd* v. *Superior Court, supra,* in order that a power may be coupled with an interest the agent must have the power to act in his own name.

Such is not the doctrine of either case. As stated in the Todd case, ''It is well settled that in order to constitute an irrevocable power of attorney there must coexist with the power a *beneficial interest* which is enforceable in the name of the attorney in fact and will survive the constituent; *or* the power must be given as security for the performance of some act of value.'' Here the beneficial interest is enforceable in the name of the agent, meaning, necessarily, the interest which the agent has, and likewise is the power given as security.

In many of the decisions we find language somewhat confusing, more through an oddity of grammatical construction than otherwise. But the main principle to be kept in mind is that the entire doctrine under discussion pertains to and is a part of the relationship of principal and agent. If we discard the element of agency entirely, then there is no need for any rule as to when an agency is irrevocable. The paramount essential of agency is the representative capacity of the agent. If there is no principal, disclosed or undisclosed, there is no agency. Therefore, when respondents contend that the power must be one that the agent exercises as a principal the argument becomes self-destructive.

■ Finally, on this subject, respondents urge the equities of the case.

Little need be noted on this phase of the case. Respondents took over the property from the Hotel Company with full knowledge of the Lane Company lease and agency, and the evidence discloses that this Lane Company contract was considered and allowed for in determining the value of the Hotel Company's land lease and the price to be paid for the building. The record supports the statement that at all times the respondents had in mind the cancellation of the Lane Company agency, and from the very outset were determined to terminate the same. It seems the clearest equity

to protect the interest of Lane Company bought and paid for as against one who advisedly purchased with knowledge thereof.

The Lane Company is bound under its contract to refrain from wilful misconduct in the execution of its agency, and the court below found that the issue of wilful misconduct had been abandoned at the trial, a conclusion from the fact that no evidence had been adduced on the part of the defendants on that issue.

Conceding then the nature of the agency, the next question presented is as to the remedy of injunction asked by plaintiff.

Respondents' contention that injunction does not lie is based chiefly on the assumption that the agency is not a power coupled with an interest. If the contrary is conceded in conformity with the holding heretofore little is left of respondents' theory on this branch of the case.

The early case of *Posten* v. *Rassette,* 5 Cal. 467, holds squarely that injunction is a proper remedy to prevent the revocation of an agency coupled with an interest. Throughout the years following this decision has never been questioned or disturbed. While the antiquity of this authority might be an argument against its present day application, yet it is much more recent than the case of *Hunt* v. *Rousmanier, supra,* the leading case to-day on the subject of powers coupled with interest.

Respondents argue that the contract in question is not capable of specific performance for the reason that it is a contract calling for personal services.

Here again the basis of respondents' contention fails. It is unnecessary to here repeat what has preceded, but the views as hereinbefore set forth likewise determine this issue. While we do not hold that the contract in question is or could be specifically enforced, deeming that unnecessary to the decision, it is a settled rule of equity that the lack of this capability does not preclude a court from decreeing injunctive relief. See California Jurisprudence, vol. 14, sec. 16 et seq., with authorities there cited.

We hold that the powers conferred in the contracts between Hotel Company and Lane Company are actual subsisting rights so connected with the property interests transferred as to entitle plaintiff to the relief prayed for.

■ Respondents seem to concede that if the powers granted are not coupled with an interest, even then they would have no *right* to revoke excepting with a liability to compensate appellant for any damage ensuing. Respondents lay much stress on the distinction between the *power* to revoke, and the right to revoke, but the authorities cited clearly indicate that where the agency is coupled with an interest the *power* to revoke does not remain in the principal. In *Boehm* v. *Spreckels,* 183 Cal. 239 [191 Pac. 5], it is said: "There is a distinction between the *power* to revoke and the right to revoke an agency. Except where the agent's power is coupled with an interest, the power always exists, but the right to revoke without liability for damages depends upon circumstances."

Respondents contend that they are not interfering with or in anywise disturbing the leasehold interest by terminating the agency, and on that theory argue that necessarily the subject matter of the present action is practically confined to the personal services involved in the agency.

As hereinbefore pointed out, the value of the lease and the continuation of the enjoyment of the estate therein conferred are so intimately interwoven with the granted power that this contention of respondents needs no further discussion.

Finally, respondents argue that they do not intend to permit the original land lease to lapse or any forfeiture to occur thereunder, and that all of the fears of plaintiff are groundless. In other words, the Lane Company is as much protected without the power as with it, and there is therefore no need for equitable interference. It may as well be argued that the lease itself should be canceled for the reason that respondents would in no event disturb the possession of appellant Lane Company. From the very first connection of Crenshaw and Smailes with the property nothing but trouble has followed. The testimony discloses discord from the very first, characterized by the exchange of personal insult and vituperation and culminating in actual physical encounter. The evidence justifies the conclusion that these defendants are convinced that their best interests lie in ridding themselves of every burden fastened on the premises by the Hotel Company agreement with Lane Company. In this condition of affairs the fears of Lane Company cannot

be said to be imaginary or groundless. The continued forbearance of appellant would but invite further aggression.

The only remaining question presented is on the scope of sections 1060 to 1062, inclusive, of the Code of Civil Procedure, dealing with declaratory relief. The court below declined to declare the rights of the parties under the contract in question, obviously deeming such declaration unnecessary. The constitutionality of those sections having been determined, there is no need to reopen that question (*Blakeslee* v. *Wilson,* 190 Cal. 484 [213 Pac. 495]). Under the decision of the trial court that the agency was revocable and justifying the action of defendants in revoking, it was almost imperative that the rights of the parties be determined and declared. As we have held the lower court in error in this finding, there no longer remains a necessity to such a degree. As we have determined the agency irrevocable, and injunction the proper remedy to prevent acts constituting a revocation, it will result in plaintiff having the management and control of the premises, together with such other powers as are contained in the contract between Hotel Company and Lane Company.

As the record shows beyond question that an actual controversy remains and is being continuously waged, we deem it the duty of the trial court upon further hearing to specifically determine and declare the rights of the parties during the term of the lease. Such questions as the right of having the building retain the name of Lane Mortgage Building, the right to display signs thereon, the right to change the uniforms of attendants or the insignia thereon should be declared. This case presents a controversy to which declaratory relief peculiarly applies. Presenting, as it does, the unusual situation of a lessee and agent in control of a valuable twelve-story building, through a lease and agency covering one floor thereof, it cannot but be anticipated that the rights of the respective parties may continue to be the subject of prolonged litigation. It was just such a case that the provisions of our law regarding declaratory relief were designed to meet and accommodate. See *Blakeslee* v. *Wilson, supra,* and cases and articles cited therein. See, also, article by W. Turney Fox, professor of law, University Southern California, in Bar Association Bulletin, volume II, No. 2, September 16, 1926, with authorities cited. Such a

declaration, being determinable upon findings of fact not made, cannot be made by this court, but remains for the court below upon the evidence therein presented.

In conclusion, it may appear that the holding results in the true ownership of the building being subordinated to a lesser interest and to that extent impaired. The obvious answer is that one may burden his property as he sees fit, within the law, and that the condition as it is here results solely from the acts of the parties themselves. Defendants possibly speculated upon their ability to cancel the agency, and took the property with their eyes wide open and evidently advised. Next, no injustice is apparent in view of the fact that wilful misconduct on the part of Lane Company is sufficient to avoid the contract. Further, it may be noted that the original land lease was the result of the efforts of Lane Company and it is fair to assume from the record that without the active aid of Lane Company the Hotel Company would not have secured the lease nor would they have been able to build at all. With these things in mind, the view changes somewhat.

With reference to the issues presented as against the defendant Clarke, these have become moot and need not be determined.

The judgment is reversed, with directions to the court below to proceed in accordance with the views herein expressed.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on September 1, 1928, and a petition by respondents to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on October 1, 1928.

All the Justices present concurred.